1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   SAMUEL ANTHONY ACINELLI, JR.,          Case No.  1:15-cv-01616-AWI-MJS (PC)

12            Plaintiff,                    **FINDINGS AND RECOMMENDATIONS TO
                                            GRANT IN PART AND DENY IN PART**
13        v.                                **DEFENDANTS' MOTION FOR SUMMARY
                                            JUDGMENT**
14   ULYSSES VILLAMIL BANIGA, et al.,
                                            **(ECF NO. 20)**
15            Defendants.
                                            **FOURTEEN DAY OBJECTION DEADLINE**
16

17

18
              Plaintiff is state prisoner proceeding pro se and in forma pauperis in this civil
19
     rights action pursuant to 42 U.S.C. § 1983. The action proceeds against Defendants
20
     Baniga and Hill on Plaintiff's Eighth Amendment claims for medical indifference, and
21
     against Defendant Baniga on Plaintiff's claims arising under state tort law. Although the
22
     parties to the instant motion have consented to Magistrate Judge jurisdiction, other
23
     unserved defendants named in the operative pleading have not.
24
              Before the Court is Defendants' August 14, 2017 motion for summary judgment.
25
     (ECF No. 20.) On November 17, 2017, Plaintiff filed an opposition. (ECF No. 26.)
26
     Defendants reply was due seven days later, on November 24, 2017. Local Rule 230(*l*).
27
     However, because November 24, 2017, was a holiday, the reply was instead due on
28

Monday, November 27, 2017. Fed. R. Civ. P. 6(a)(1)(C). Despite this deadline, Defendants filed their untimely reply and objections to Plaintiff's evidence on January 25, 2018. (ECF Nos. 27- 29.)

The matter is submitted. Local Rule 230(*l*). For the reasons stated below, the undersigned will recommend that the motion be denied.

## I. Defendants' Late Filings

As stated above, Defendants' reply was due by November 27, 2017. Defendants' January 25, 2018 filings were thus nearly two months late. The filings are untimely and no cause has been shown to excuse this defect. The Court will not consider them.

The Court will nevertheless independently consider whether Plaintiff's submissions are adequate and sufficient to defeat summary judgment. Only evidence that would be admissible may be considered in ruling on a motion for summary judgment. Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002); see also Fed. R. Civ. P. 56(c). In determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered. Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. Id. (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because, at trial, plaintiff's testimony of contents would not be hearsay). However, a court may not consider inadmissible hearsay evidence which could not be presented in an admissible form at trial. See Medina v. Multaler, Inc., 547 F. Supp. 2d 1099, 1122 (C.D. Cal. 2007) ("Medina bases much of her declaration on hearsay evidence that will not be admissible at trial. Medina will not, for example, be able to take the witness stand at trial and recount statements that constitute hearsay, double hearsay, or triple hearsay.").

The Court has aplied these principles in evaluating the evidence presented by Plaintiff.

## II.    Legal Standard on Summary Judgment

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Wash. Mut. Inc. v. United States, 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed R. Civ. P. 56(c)(1).

Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). Defendants do not bear the burden of proof at trial and, in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Secs. Litig., 627 F.3d 376, 387 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984, and it must draw all inferences in the light most favorable to the nonmoving party, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011).

## III.    Plaintiff's Allegations

In relevant part, Plaintiff's allegations may be summarized essentially as follows:

Plaintiff is fifty years old and suffers from numerous gastrointestinal issues stemming from complications of a 1985 operation for a major upper gastrointestinal bleed caused by ulcers. During that surgery, Plaintiff had a two-thirds gastrectomy (partial removal of the stomach), a vagotomy (cutting of the vagus nerve), and a

pyloroplasty with duodenal oversew (widening of the opening between the stomach and small intestine).

Because of Plaintiff's surgery, he suffers from dumping syndrome and must closely monitor his diet. Otherwise, he experiences tachycardia (an elevated heart rate), stomach and rectal spasms, perfuse sweating, extreme bloating, nausea, dizziness, and colorectal and esophageal damage.

Plaintiff originally received a Therapeutic Special Diet Chrono on August 26, 2010, from the CCI Facility-D Medical Clinic after medical testing by primary care provider ("PCP") and non-party Dr. El Said. Dr El Said concluded that Plaintiff indeed suffered from dumping syndrome. Non-party Chief Medical Officer Dr. Clark approved the August 26, 2010, Therapeutic Special Diet Chrono.

From August 26, 2010 to January 17, 2012, Plaintiff did not receive a special diet, and on January 17, 2012, he was transferred to the California Institution for Men ("CIM") in Chino, California. Plaintiff did not receive a special diet at CIM either. Plaintiff was eventually transferred back to CCI.

At some point after being transferred back to CCI, Plaintiff did eventually begin again receiving special diet and nutritional supplements[1], but on November 7, 2014, Defendant Dr. Baniga directed Plaintiff's PCP, Defendant Dr. Hill, to discontinue the Special Diet Chrono and deny Plaintiff a consultation with a gastroenterologist for a colonoscopy. Dr. Hill told Plaintiff that Dr. Baniga did not think dumping syndrome required a special diet and supplements; Dr. Baniga also allegedly cited to costs as a reason for the discontinuation.

On several occasions, including November 7 and December 26, 2014, and during the third week of February 2015, Plaintiff described to Drs. Baniga and Hill in detail the pain and discomfort he experienced due to his gastrointestinal issues. However, neither Defendant re-instated the Special Diet Chrono. Defendant Baniga stated he stood by his

---

[1] Also referred to herein as liquid nutritional supplements or "LNS."

4

decision and otherwise ignored Plaintiff's complaints. Plaintiff claims that neither doctor ever examined Plaintiff before discontinuing the Special Diet.

In December 2014, Plaintiff submitted a health care appeal contesting Dr. Baniga's determination that he did not need a therapeutic diet. On December 26, 2014, Dr. Hill conducted a hearing on Plaintiff's appeal and said that dumping syndrome did not warrant liquid nutritional supplements, therapeutic special diets, or a colonoscopy. She cited costs as a reason for the denial.

At the first level of review of Plaintiff's appeal, Dr. Baniga issued a decision granting Plaintiff's appeal in non-relevant part, but denying his request for a therapeutic diet and  referral to a gastroenterologist on the grounds that they were not medically necessary. Plaintiff then appealed to the second level, where the decision was upheld by a non-party. The appeal was again denied at the Director's Level, with the notation that Plaintiff was seen by a PCP on February 24, 2015, who determined that Plaintiff's labs did not indicate any deficiencies and documented no dumping episodes since Plaintiff's last visit.  Plaintiff's PCP further documented no additional issues found on endoscopy that would warrant a change in Plaintiff's current treatment plan, and advised Plaintiff to adhere to a diet of small meals. The Deputy Director also found that based on Plaintiff's medical evaluation, he did not meet the specified criteria to qualify for nutritional supplements or a therapeutic diet.

On April 22, 2015, Plaintiff filed a Government Claims Form against Dr. Baniga with the California Victim Compensation and Government Claims Board seeking monetary damages regarding his state tort claims arising on November 17, 2014. In a letter dated June 26, 2015, the Victim Compensation and Government Claims Board notified Plaintiff that they had rejected Plaintiff's claim.

Plaintiff suffered and continues to suffer abdominal pain, bloating, cramping, dumping episodes, colorectal spasms, painful bowel movements, elevated heart rate, weakness, damage to his anus, humiliation, and emotional distress as a result of Dr.

Baniga's actions. Plaintiff has suffered emotional distress to the point of being entirely distrustful of medical professionals, and is therefore unable to seek treatment for other medical issues (not discussed in his case).

**IV. Discussion**

Defendants seek summary judgment on the following grounds: (1) they were not deliberately indifferent to Plaintiff's medical needs, (2) they are entitled to qualified immunity, and (3) his state tort claims fail on the merits.

**A. Undisputed Facts**

Despite various disputes regarding the motives of the respective parties, the records before the Court reflect that most of Plaintiff's medical history is undisputed. Except where otherwise noted, the undisputed facts are as follows.

Plaintiff is in the custody of the California Department of Corrections and Rehabilitation at CCI in Tehachapi, California. At all times relevant to this action, Defendants Baniga and Hill were medical doctors providing services at CCI.

In 1985 or 1986, Plaintiff had major abdominal surgery that resulted in some degree of post-operative dumping syndrome. Dumping syndrome can cause bloating, nausea, diarrhea, dizziness, weakness, sweating, and a rapid heartbeat. Some such patients have trouble consuming large amounts of any kind of food. Patients with dumping syndrome must deploy sensible eating habits, including eating up to six small meals daily, avoiding drinking liquids with meals, and avoiding sweets such as candy and cake. Meals should be high in fiber and protein and low in carbohydrates. The severity of Plaintiff's dumping syndrome is disputed.

The need for Plaintiff to alter his diet to avoid complications of dumping syndrome was noted by CDCR medical personnel at least as early as 2004. On February 2, 2004, Dr. Neubarth issued Plaintiff a medical chrono allowing him to receive an extra sack lunch every day for a year. (ECF No. 26 at 123.) On February 16, 2005, Dr. Hsu issued a chrono requiring that Plaintiff be provided an extra meal at 4:00 p.m., and that he avoid

peanut butter and beans. (ECF No. 26 at 121.) In May 2006, Dr. Duenas issued a chrono for Plaintiff to receive a "therapeutic diet"[2] consisting of an extra meal and no diary, beans, or bread. (ECF No. 26 at 119.) In September 2006, Dr. Duenas extended the prohibitions of the "therapeutic diet" to exclude peanuts, beans, wheat, gravies, sweets, and dairy. (ECF No. 26 at 117.)

In August 2010, Plaintiff was referred to a dietician. The dietician recommended frequent small meals, and noted Plaintiff was unable to tolerate dairy, refined carbohydrates, and certain food high in fiber. (ECF Nos. 26-1 at 33; 20-3 at 40.) As a result, on August 26, 2010, Dr. Clark issued a chrono for frequent small meals. (ECF Nos. 26 at 138; 20-3 at 56.) Similarly, on October 1, 2010, Dr. El Said issued a chrono for frequent small meals. (ECF Nos. 26 at 115; 20-3 at 47, 53.) On April 27, 2011, Dr. El Said issued a chrono for Plaintiff to be provided two lunch meals daily. (ECF No. 26 at 113.) During this period, Plaintiff was engaged in the pursuit of a medical appeal on the ground he was not being provided the therapeutic diet recommended by the dietician. (ECF No. 26 at 64.) His appeal was ultimately denied at the Director's Level, in part because Dr. El Said's April 27, 2011 chrono had already ordered that Plaintiff be provided an extra lunch. (Id.)

On February 1, 2012, Dr. Torres issued a chrono providing Plaintiff "more time during meals" while at CIM. (ECF Nos. 26 at 109, 111; 20-3 at 66.) On October 2, 2012, Plaintiff was seen by a "float" physician in relation to a healthcare appeal. (ECF Nos. 26 at 73; 20-3 at 26.) The physician noted that Plaintiff already had been provided extra time for meals and explained that Plaintiff also could save a portion of his sack lunch for an extra meal. Nonetheless, the float physician spoke with "the physicians at West Yard" regarding an unspecified accommodation that was being considered "pending review

---

[2] Defendants' expert contends that Plaintiff never received a "therapeutic" or "special" diet because those are terms of art referring to specific, limited diets available in prison and in the free world. Nevertheless, it is undisputed that various physicians in this case ordered that Plaintiff receive accommodations in relation to his diet. The Court does not find the terms "therapeutic diet" or "special diet" to be dispositive of Plaintiff's claims.

with the Chief Physician." (ECF No. 26 at 75.)

On February 20, 2013, Plaintiff saw Dr. Torres, who noted that Plaintiff was to continue diet modification with slower eating and more time during meals. He was to divide his sack lunch into two smaller portions. Due to hyperlipidemia, Plaintiff was told to avoid foods high in cholesterol. (ECF No. 20-3 at 62-63.)

At some point thereafter, Plaintiff was transferred back to CCI where he came under the care of Defendant Hill. On July 29, 2013, Plaintiff saw Defendant Hill, who noted, "We will decide regarding nutritional supplement or what the patient is actually requesting, which is to receive 2 lunchtime meals." (ECF Nos. 26-1 at 22; 20-3 at 72-73.) Ultimately, Dr. Hill issued a chrono for what she characterized as a "therapeutic diet" consisting of "1 can nutritional supplement at noon." (ECF Nos. 26 at 107; 20-3 at 75.) On November 22, 2013, she continued the chrono for 1 can of nutritional supplement. (ECF Nos. 26 at 105, 20-3 at 78.) On January 3, 2014, she increased this to "1 can nutritional supplement three times a day." (ECF Nos. 26 at 103, 20-3 at 81.) This was continued on January 14, 2014. (ECF No. 26 at 101.)

On May 14, 2014, Plaintiff presented for a visit with Dr. Hill. (ECF No. 20-4 at 29.) He complained that he was having issues with custody staff permitting him to use the bathroom when needed. For example, when he was in visiting, he was not permitted to use the bathroom without terminating his visit. Hill noted she did not believe it appropriate "in this environment" to issue a chrono that would allow Plaintiff to use the bathroom wherever or whenever he needed. She stated that she would discuss this issue with the Chief Physician and Surgeon and/or the Chrono Committee. (ECF No. 20-4 at 29.)

Defendant Hill did, indeed, discuss Plaintiff's course with the Chief Physician and Surgeon (Dr. Baniga) and the Chrono Committee. According to Dr. Hill, the Chrono Committee stated that Plaintiff should be able to eat multiple small meals without specific accommodation from medical. (ECF No. 20-4 at 4.) The Chrono Committee also

collectively decided to terminate Plaintiff's LNS. (ECF No. 20-5 at 2.) They did so based on guidelines that identify only four "therapeutic" diets (gluten-free, renal, pre-renal, and hepatic), and only four criteria for receipt of LNS (malnourishment, end stage liver disease, esophageal condition, or dental condition). (ECF No. 20-5 at 2, 35-36.) As Plaintiff did not meet the criteria for a "therapeutic diet" or LNS, and was additionally overweight, they decided to terminate the LNS. (ECF No. 20-5 at 2.) Dr. Hill agreed with the decision. (ECF No. 20-4 at 4.)

As a result, Plaintiff was brought in to see Dr. Hill on November 7, 2014 to discuss discontinuation of his LNS. (ECF Nos. 26 at 201-02; 20-3 at 84-85.) Hill noted that Plaintiff had a history of double portion meals or LNS. "When we last addressed nutritional supplements, the double portion meals were not something that Custody was willing to maintain, so the drinks were given." However, she noted that Plaintiff's case had come up in an "MD/Chrono meeting" and "the consensus was that he did not need nutritional supplements." The process of removing these from Plaintiff's chronos was begun. Plaintiff's request for a colonoscopy also was denied. (Id.)

On December 26, 2014, Plaintiff saw Dr. Hill in relation to an appeal requesting reinstatement of a therapeutic diet or nutritional supplements. Hill acknowledged in her notes that she previously had told Plaintiff she thought there was a possibility he was "playing" her due to there being no objective evidence of his dumping syndrome. She reiterated that the need for supplements was recently reviewed by Chief Physician and Surgeon and the Chrono Committee, that the Chrono Committee recommended discontinuing supplement, and that it therefore was discontinued. She also noted that the nutritional supplement was high in sugar and therefore not indicated. Hill specifically noted, "His request to reinstate therapeutic diet nutritional supplement is denied on the grounds that the patient is able at his own expense to provide himself with an anti-dumping diet." Plaintiff was told to document his dumping episodes. (ECF Nos. 26 at 196; 20-4 at 32-33.) At another point that day, Plaintiff presented to the clinic for

documentation of his dumping syndrome symptoms, including bloating, tachycardia, shortness of breath and profuse sweating. (ECF No. 26 at 198.) According to Hill, these complaints were not substantiated by nursing. (ECF No. 20-4 at 5.)

Plaintiff saw Dr. Hill again on January 27, 2015. (ECF No. 26 at 193.) Relevant here, Hill noted only that the nutritional supplement was being discontinued.

Plaintiff underwent an EGD with Dr. Wong on February 6, 2015, for symptoms of dysphagia. Dr. Wong found a hiatal hernia and recommended that Plaintiff adopt the GERD diet. (ECF Nos. 26-1 at 103; 20-3 at 37-38.) The GERD diet calls for small portions and limitations on coffee, spices and fats. (ECF No. 20-3 at 5 n.4.)

Plaintiff saw Dr. Hill again on February 24, 2015 and one again noted, as relevant here, only that the nutritional supplement was discontinued. (ECF No. 26 at 191.) This was her last visit with Plaintiff.

It is undisputed that Dr. Baniga conversed with Plaintiff regarding the discontinuation of his nutritional supplement. (ECF No. 26 at 80, 81.) Plaintiff claims that these conversations occurred on several occasions and that Plaintiff described to Dr. Baniga in detail the pain and discomfort he experienced due to his gastrointestinal issues. Dr. Baniga does not aver to the contrary.[3]

Both parties present records of Plaintiff's course of treatment subsequent to that provided by Defendants Baniga and Hill. The majority of these are not relevant to the Court's analysis. In brief summary, Plaintiff continued to complain that the standard CDCR meal caused him severe GI and rectal pain. He reported that he instead chose to eat multiple meals per day from the canteen. He requested diet modifications from medical personnel with limited, if any success.

On August 4, 2017, Plaintiff underwent a colonoscopy, which revealed hemorrhoids. He was recommended for a repeat colonoscopy in five years. (ECF No. 26-1 at 112.)

---

[3] It appears that at least one page of Dr. Baniga's declaration is missing from the record. (See ECF No. 20-5.)

### B. Legal Standard – Deliberate Indifference to Medical Needs

The Eighth Amendment's Cruel and Unusual Punishments Clause prohibits deliberate indifference to the serious medical needs of prisoners. McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992). A claim of medical indifference requires (1) a serious medical need, and (2) a deliberately indifferent response by defendant. Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). The deliberate indifference standard is met by showing (1) a purposeful act or failure to respond to a prisoner's medical need and (2) harm caused by the indifference. Id. Where a prisoner alleges deliberate indifference based on a delay in medical treatment, the prisoner must show that the delay led to further injury. See Hallett v. Morgan, 296 F.3d 732, 745-46 (9th Cir. 2002); McGuckin, 974 F.2d at 1060a; Shapley v. Nevada Bd. Of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam). Delay which does not cause harm is insufficient to state a claim of deliberate medical indifference. Shapley, 766 F.2d at 407 (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)).

"Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" Id. at 1057 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" Id. (brackets omitted) (quoting Gibson, 290 F.3d at 1188). Mere indifference, negligence, or medical malpractice is not sufficient to support the claim. Broughton v. Cutter Labs., 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle v. Gamble, 429 U.S. 87, 105-06 (1976)). A prisoner can establish deliberate indifference by showing that officials intentionally interfered with his medical treatment for reasons unrelated to the prisoner's medical needs. See Hamilton v. Endell, 981 F.2d 1062, 1066 (9th Cir. 1992); Estelle, 429 U.S. at 105.

## C. Analysis

### 1. Treatment for Dumping Syndrome

While there is some dispute regarding the severity of Plaintiff's dumping syndrome, there is no dispute that it constitutes a serious medical need. Plaintiff has undergone extensive abdominal surgery and as a result, experiences up to eight bowel movements per day, pain, bloating, hemorrhoids, anal bleeding, and other symptoms. Jett, 439 F.3d at 1096 (a "serious medical need" may be shown by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain'"); McGuckin, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment.").

Furthermore, viewing the facts in the light most favorable to Plaintiff, and construing all inferences in his favor, the Court finds the present record insufficient to support summary judgment in Defendants' favor. It is undisputed that small, frequent meals are appropriate for managing dumping syndrome. (ECF Nos. 20-3 at 5; No. 20-4 at 3.) Numerous doctors over the course of Plaintiff's incarceration have recommended that Plaintiff be given small, frequent meals and/or additional meal time in order to manage his symptoms. A nutritionist also supported this recommendation. It appears, however, that Plaintiff initially had difficulty with this accommodation because he was unable to take food from the chow hall in order to spread his meals throughout the day. As a result, he was provided with an additional sack lunch. However, custody staff at CCI was unwilling to accommodate this solution. As a result, Dr. Hill provided Plaintiff with a chrono for LNS. In other words, the decision to discontinue Plaintiff's additional meals and to substitute LNS was made, not for medical reasons, but in response to custody concerns. To be clear: there is absolutely no evidence before the Court to

suggest that small, frequent meals were not medically necessary, or that the discontinuation of Plaintiff's extra meal was medically acceptable under the circumstances. Interference with medical treatment for reasons unrelated to a prisoner's medical needs is a hallmark of deliberate indifference. See Hamilton, 981 F.2d at 1066; Estelle, 429 U.S. at 105.

Nonetheless, Plaintiff appeared to be satisfied with the substitution for LNS instead of an extra meal. Records from this time period reflect few complaints relative to his dumping syndrome. It therefore appears that LNS was an adequate substitute for the more traditional accommodation, i.e. the extra meal that Plaintiff actually requested.

Dr. Hill and Dr. Baniga, and their expert Dr. Barnett, opine that the discontinuation of LNS was medically appropriate because LNS was not warranted: Plaintiff was overweight and had no signs of malnutrition. He did not require nutritional supplementation. They ignore, however, the very reason LNS was instituted: to accommodate Plaintiff's inability to otherwise consume the medically necessary, small, frequent meals. There is no evidence before the Court to suggest that the defendants considered this issue when deciding to discontinue the LNS. Furthermore, the Court may not, on summary judgment, discount Plaintiff's statement that he was told that cost was a driving factor in this decision. Lastly, it is undisputed that Dr. Baniga directly participated in this decision and thereafter discussed the decision with Plaintiff. He therefore cannot escape liability on the ground that he did not "order" the discontinuation of LNS. On these facts, a reasonable juror could very well find in Plaintiff's favor as to the claims against both defendants.

Finally, the Court addresses the claim implicit in Dr. Barnett's declaration that Plaintiff could cobble together a nutritionally sound and medically appropriate diet by ignoring foods contained in the standard CDCR prison diet that aggravate his dumping syndrome. In this regard, the Court notes that numerous restrictions have been placed on Plaintiff's diet. At various times, he has been told to avoid: peanuts, beans, dairy,

bread, wheat, gravies, sweets, refined carbohydrates, certain foods high in fiber, coffee, spices and fats. The only information before the Court regarding the prison's standard diet is that it contains an excess of calories. There is nothing before the Court regarding the types of foods provided, and whether the meals would be calorically adequate after removing the aforementioned foods. Dr. Barnett addresses the adequacy of this prison diet only in relation to the restrictions of the GERD diet, one of Plaintiff's several restrictions. In contrast, Dr. Hill places the onus for adequate nutrition on Plaintiff, noting that Plaintiff is free to, and does, purchase his own calorically adequate and medically indicated diet. However, it is the prison's responsibility under the United States Constitution to provide Plaintiff with adequate nutrition. See LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993) (Eight Amendment requires that "prisoners receive food that is adequate to maintain health"). Defendants cannot avoid summary judgment on this basis.

Summary judgment on this claim should be denied.

## 2. Colonoscopy

The Court concludes that summary judgment should be granted in Defendants' favor on that aspect of the claim dealing with the denial of a colonoscopy. It is undisputed that Plaintiff underwent a colonoscopy in 2017, which revealed only hemorrhoids. However, it was well-known, well before the colonoscopy, that Plaintiff suffered from hemorrhoids. There is no evidence that the delay in receiving a colonoscopy caused Plaintiff any harm. Shapley, 766 F.2d at 407. Defendants are entitled to summary adjudication of this claim.

## 3. Qualified Immunity

Defendants contend that they are entitled to qualified immunity on Plaintiff's claims. Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Resolving a claim of qualified immunity requires courts to determine whether the facts alleged, when taken in the light most favorable to the plaintiff, violated a constitutional right, and if so, whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001). While often beneficial to address in that order, courts have discretion to address the two-step inquiry in the order they deem most suitable under the circumstances. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

"The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." Pearson, 555 U.S. at 244. Therefore, "[i]f the [defendant's] mistake as to what the law requires is reasonable . . . the [defendant] is entitled to the immunity defense." Saucier v. Katz, 533 U.S. at 205. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

Here, it is well-established that prison officials may not deliberately interfere in medical treatment for non-medical reasons, and may not deliberate deny all treatment for serious medical needs. Viewed in the light most favorable to Plaintiff, the facts in this case show that defendants did both. Even assuming Defendants could be entitled to qualified immunity for discontinuing LNS based of prison guidelines, they thereafter failed to offer alternative accommodations. On this basis alone, they are not entitled to qualified immunity.

### 4. State Law Claims

Defendants argue that Defendant Hill is entitled to summary judgment on Plaintiff's state law claims because Plaintiff did not exhaust a California Torts Claim Act claim against her. As the complaint contains no state law claims against Defendant Hill, the Court will not address this issue. The Court will analyze solely the claims as to Defendant Baniga. Plaintiff brings claims against Defendant Baniga for negligence, medical malpractice, and negligent infliction of emotional distress.

A public employee is liable for injury to a prisoner "proximately caused by his negligent or wrongful act or omission." Cal. Gov't Code § 844.6(d). "Under California law, '[t]he elements of negligence are: (1) defendant's obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty); (2) failure to conform to that standard (breach of duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages).'" Corales v. Bennett, 567 F.3d 554, 572 (9th Cir. 2009) (quoting McGarry v. Sax, 158 Cal. App. 4th 983, 994 (2008)). For negligence claims based on medical malpractice, defendant has a duty "to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise." Hanson v. Grode, 76 Cal. App. 4th 601, 606 (1999). To establish a claim for negligent infliction of emotional distress Plaintiff must allege: (1) a legal duty to use due care; (2) a breach of such duty; (3) legal cause; and (4) damages caused by the negligent breach. Friedman v. Merck & Co., 107 Cal.App.4th 454, 463 (2003).

California law requires that a competent, qualified medical expert offer evidence that the defendant's actions or inaction fell below a standard of care owed to Plaintiff and caused him harm. Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988) (internal citations omitted). California courts have incorporated the expert evidence requirement into their standard for summary judgment in medical malpractice and negligent infliction of emotional distress cases.[4] When a defendant moves for summary judgment and supports his motion with expert declarations that his conduct fell within the community standard of care, he is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence. Willard v. Hagemeister, 121 Cal. App. 3d 406, 412 (1981).

---

[4] Under California law, "the negligent causing of emotional distress is not an independent tort, but the tort of negligence." Burgess v. Superior Court, 2 Cal.4th 1064 (1992). A claim of negligent infliction of emotional distress "contains the traditional elements of duty, breach, causation and damages." Jacoves v. United Merchandising Corp., 9 Cal.App.4th 88, 106 (1992). Consequently, the claim for negligent infliction of emotional distress is subject to these same requirements when concerning a medical professional.

Here, Defendants have offered the expert declaration of Dr. Barnett stating that the discontinuation of LNS was medically appropriate under the circumstances because it was not medically indicated. Plaintiff presents no qualified testimony to the contrary. Nonetheless, Dr. Barnett does not address the critical question of whether Defendant Baniga's decision to discontinue LNS was appropriate in light of the unavailability of other means of providing Plaintiff with small, frequent meals. In other words, Dr. Barnett's declaration addresses only one limited piece of the puzzle. The declaration ultimately is insufficient to be dispositive.

The Court also rejects the argument that Dr. Baniga did not cause Plaintiff harm. Plaintiff alleges the contrary. This dispute cannot be resolved on summary judgment.

The Court will, however, recommend that summary judgment be granted on the state law claims to the extent they are based on the denial of a colonoscopy because, as stated above, Plaintiff suffered no injury as a result of the denial.

## V.    Conclusion and Recommendation

Based on the foregoing, it is HEREBY RECOMMENDED that Defendants' motion for summary judgment be granted in part and denied in part as follow:

1. Summary judgment should be granted in favor of Defendants on Plaintiff's Eighth Amendment and state law claims based on the denial of a colonoscopy; and

2. In all other respects, the motion should be denied.

The findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within **fourteen** (14) days after being served with the findings and recommendations, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file

objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   April 9, 2018                    /s/ *Michael J. Seng*
                                    UNITED STATES MAGISTRATE JUDGE